Law Offices of
ISABEL M. AMSEL
110 S. Church Ave. #436
Tucson AZ 85701
 (AZ Bar No. 023945)
Email: *isabelamsel@outlook.com*
Telephone: (520) 400-0721
Attorney for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-2655-RM-2 |
| Plaintiff, | |
| v. | **SENTENCING MEMORANDUM** |
| Monserrat Sofia Miranda, | |
| Defendant. | |

COMES NOW the defendant, Monserrat Sofia Miranda, by and through undersigned Counsel, and provides this memorandum and requests this Court consider the arguments contained herein during sentencing.

RESPECTFULLY SUBMITTED this 14th day of February, 2024.

Law Offices of
ISABEL MICHELA AMSEL

/s/*Isabel Michela Amsel*
ISBAEL MICHELA AMSEL
Attorney for Defendant

1

PRESENTENCE REPORT AND PLEA AGREEMENT SUMMARY

The defendant, Monserrat Sofia Miranda, pleaded guilty to Count Two (2) of the Indictment, charging the defendant with Conspiracy to Export Firearms, in violation of Title 18, United States Code, Sections 371 and 554(a). She pleaded guilty with a plea agreement.

The Pre-Sentence Investigation Report makes the following calculations: a base offense level of 26; a 2-level decrease for demonstrating acceptance of responsibility for the offense; and a 1-level decrease for a timely notification of the intention to enter a plea of guilty. The resulting total offense level is 23.

Ms. Miranda has no juvenile or adult criminal history and therefore the subtotal and total criminal histories are both zero (0). According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

Based upon a total offense level of 23 and a Criminal History Category of I, the guideline imprisonment range is 46 months to 57 months; despite the 10-month cap in the negotiated plea, the PSR recommends rejecting the plea and a sentence of 24 months.

However, the defendant and the United States purposefully negotiated a plea below the USSG ranges based on evidence and comparative responsibility, as such, both the Government and the Defendant urge the Court to accept the plea and sentence the defendant within the stipulated 0-10 month range. Pursuant to USSG §3E1.1(a), the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level if the defendant demonstrates an acceptance of responsibility for the offense.

### **MITIGATION: 18 U.S.C. § 3553(a)**

The United States Supreme Court "… has long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing a

sentence and that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Williams v. New York,* 337 U.S. 241, 246–247, 69 S.Ct. 1079 (1949).

"Congress codified this principle at 18 U.S.C. § 3661, and at § 3553(a), which sets forth certain factors that sentencing courts must consider, including 'the history and characteristics of the defendant,' § 3553(a)(1). *Pepper v. United States*, 562 U.S. 476, 476–80, 131 S. Ct. 1229, 1235 (2011). Courts need not find any extraordinary circumstance to sentence a defendant outside the guidelines range, once courts correctly calculate the guidelines and make an individualized determination of a sentence that meets sentencing objectives. *United States v. Booker*, 543 U.S. 200, 125 S. Ct. 728 (2005); 18 U.S.C. § 3553. *Gall v. United States*, 522 U.S. 38, 47, 128 S. Ct. 586, 595 (2007).

In determining the sentence, the sentencing court should: (1) calculate the correct guidelines range; (2) determine whether to depart by considering Chapter Five, parts H and K, and any other policy statement or commentary in the Guidelines Manual; and (3) determine whether to impose a "variance" sentence by considering the factors set forth in 18 U.S.C. § 3553(a). U.S.S.G. §1B1.1, Application Instructions (2012).

**Request for Variance: History and Characteristics of the Defendant, Aberrant Behavior**

Monserrat Sofia Miranda is twenty-three (23) years old. She was born in Tucson and has lived her whole life here. She and her family – mother Isidra, father Raymundo, and siblings Maria, Mariela, Diana, and Paola – have always lived on the southside of Tucson. Her father owns a mobile home installation business, and her mother is a homemaker who assists with the family business.

The Miranda family emphasizes the importance of education, and Monserrat recalls that her parents, in addition to providing her with food and shelter and warmth, always supplied her with school items and books and extolled the virtues and opportunities of education. She explains that her parents "always pushed for her to do well in school."

Although her family environment was generally positive, it was marred by a serious incident. When she was around seven (7) or eight (8) Monserrat recalls that a cousin, who had been staying with the Mirandas, sexually assaulted her older sister Maria (then aged nine [9]) while Monserrat was in the same bed. Her family filed a police report and the incident caused a deep rift between her mother Isidra's family and the Mirandas. The experience has left Monserrat with lingering trauma and is a source of deep pain to this day. Thankfully, her relationship with her father's family, including aunts and an uncle, remains positive, and Monserrat sees them often.

As stated above, Monserrat Miranda has a criminal history score of zero (0). This incident, while serious and regrettable, is aberrant behavior for this individual. Here the defendant is not moving for a departure but provides the USSG definitions to support a variance. USSG §5K2.20 allows a district court to depart downward in an "extraordinary" case if the defendant's behavior is found to be "aberrant". Aberrant behavior is defined as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life" *United States v. Smith*, 387 F.3d 826, 833 (9th Cir. 2004).

Apart from this incident, Monserrat has never been in trouble with the law and has always focused on excelling in school. In 2019 she finished in the top ten (10) of her graduating class at Desert View High School in Tucson. She was a member of the National Honor Society

and has received numerous academic awards. While pursuing her high school diploma, Monserrat concurrently attended Pima Joint Technical Education District (JTED) where she completed a Health Care Foundations program and received a certificate as a Personal Assistant Caregiver. According to Monserrat, she was offered scholarships to several universities including Northern Arizona University, Grand Canyon University and the University of Arizona. She chose to attend U of A, to be close to her family while she pursued her degree.

Demonstrating her commitment to personal growth and community involvement, Monserrat volunteered in the Pima County Library system and has also volunteered in hospitals while doing her clinicals. Additionally, demonstrating her commitment to education, she participated in a summer program called *New Start* in 2019, which helps new students adjust to college life. At the time of the incident, Monserrat was a junior at U of A.

**Request for Variance: Culpability and Acceptance of Responsibility**

Monserrat accepts full responsibility for her actions and is extremely remorseful. She watched her parents work very hard all their lives and when she got into financial trouble, unable to pay her tuition, she unfortunately followed up on a Snapchat message and ended up becoming connected to the Mexican Cartel. Although Monserrat was enticed by money and agreed to participate, she was not a sophisticated person- dealing with the Cartel was way above her experience and socialization, making her an easy and vulnerable target.

Importantly, Monserrat had no role in planning, arranging funding, or making any kind of decision at all. While a departure for mitigating role is not argued, a variance based on the defendant's relative responsibility is justified here. Like a criminal organization that traffics in drugs, firearms organizations are multi-tiered: those at the top have the most control and get the most benefit. Smuggling firearms is not limited to a driver or courier; rather decisions must be

made, and arrangements executed all along a complicated route that often takes weeks from beginning to end, crossing international boundaries and involving a variety of resources such as vehicles, cell phones, and bank accounts. Monserrat's relative responsibility should be assessed and accounted for at sentencing.

The Court is asked to consider the policy statement in the guidelines as a basis for variance rather than departure. The defendant's role in the offense may decrease the offense level in the following ways: "(a) [i]f the defendant was a minimal participant in any criminal activity, decrease by 4 levels. . . ." and "(b) [i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels. . . ." U.S.S.G. §3B1.2. The guidelines describe these roles as "substantially less culpable than the average participant" and as one who "performs a limited function." U.S.S.G. §3B1.2, Application Note 3(A). Further, the guidelines define a minimal participant as

> ". . . a defendant . . . who plays a minimal role in the criminal activity. It is intendent to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities is indicative of a role as minimal participant."

U.S.S.G. §3B1.2, Application Note 4.

Additionally, the guidelines define a minor participant as ". . . a defendant described in Application Note 3(A) who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. §3B1.2, Application Note 5. Further, when determining mitigating-role adjustments, courts have held that defendant's activity will be compared to "other participants in the defendant's crime, not to typical defendants who commit similar crimes." *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022) (citing *United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018)). With no decision-making abilities or full understanding of the operation, Monserrat Miranda performed a limited function.

The U.S.S.G., 3B1.2 provides five factors to be considered and analyzed to determine role in the offense:

"In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:

**(i)** the degree to which the defendant understood the scope and structure of the criminal activity;
**(ii)** the degree to which the defendant participated in planning or organizing the criminal activity;
**(iii)** the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
**(iv)** the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
**(v)** the degree to which the defendant stood to benefit from the criminal activity."

U.S.S.G. 3B1.2

"We have… held that district court must consider all of [the] factors [of Application Note 3(C) (i)-(v) when determining whether to grant a mitigating- role adjustment." *United States v. Rodriguez*, 44 F.3d 1229,1233 (9th Cir. 2022) (citing *Quintero-Leyva*, 832 F.3d 519,523 (9th Cir. 2016).

When analyzing this defendant's conduct and taking into consideration her lack of criminal history or mentality, the Court can readily find that a variance related to limited culpability is justified here, and is accounted for in the negotiated plea.

Monserrat acknowledges it was lacking maturity and foresight – she did not connect what she was doing with the seriousness of consequences, both to herself and to others. Looking back, Monserrat felt under extreme pressure and was not thinking straight; she is now in treatment for depression and other symptoms likely related to unresolved childhood sexual trauma. Monserrat is highly unlikely to ever find herself making a similar error.

7

Monserrat explains that as a result of her arrest, she was summarily dropped from her program at U of A. Additionally, she says that she has been forced to pay the university back money. She completed three years of her program and was only two semesters away from graduating; now she is uncertain whether or not she will be able to complete this degree to which she has dedicated years of her life. If necessary, Monserrat plans to switch majors to economics. She is willing to do whatever it takes to achieve her dream of graduating with a university degree.

In addition to this interruption and possible cessation of her university ambitions, Monserrat now faces fears about her employability. She has worked as a caregiver in the past and worries that once her fingerprint card expires, she will no longer be able to pursue this line of work.

At only the age of 23, as a result of a single mistake for which she has accepted full responsibility, Monserrat Sofia Miranda's life has turned upside down. We ask the court to sentence Ms. Miranda to time served, so that she may focus on rebuilding and reorienting her future. She understands now the seriousness of her crime, and has already experienced grave consequences that have altered the course of her life. Imprisonment would only set her further back on a quest she has already begun: the quest to return to the law-abiding, community-oriented life that she has always led.

**<u>SENTENCING RECOMMENDATION</u>**

Given all the characteristics of this defendant and her situation, the Court is asked to sentence the Monserrat Sofia Miranda to time served. A variance is justified given the fact that the defendant has exhibited impeccable behavior during her release; and given her demonstrated commitment to improving herself through education and community involvement. Incarcerating

the defendant, who has already experienced significant real-world punishment for her action, can only serve to push her further back on her quest to resume her former law-abiding and community-oriented life.

Further, because she is a childhood sexual abuse victim, a sentence of incarceration will likely re-traumatize Monserrat and may make it much harder for her to re-integrate into society. Current epidemiological research provides overwhelming evidence that, at least during the first 18 years of life, exposure to adverse childhood experiences (ACEs) is associated with long-term effects on brain development, quality of life, and the likelihood of developing many of the most life-threatening conditions impacting public health worldwide, including cardiovascular disease and cancer. Although Monserrat's adverse experience was limited, it was severe and has had life-long consequences.

Monserrat was a successful, aspiring student and scientist; her poor decision has resulted in many doors being closed in her future. Nevertheless, she is thriving and has demonstrated her ability to comply with any and all conditions the Court may impose to avoid incarceration. These measures could include a period of house arrest/electronic monitoring along with mental health conditions to keep Monserrat on the trac of stability and recovery.

RESPECTFULLY SUBMITTED this 14th day of February, 2024.

Law Offices of
ISABEL MICHELA AMSEL

/s/*Isabel Michela Amsel*
ISBAEL MICHELA AMSEL
Attorney for Defendant

Distribution: All ECF Participants